## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

**MARY BADDER,**

              **Plaintiff,**                    **No. 13-cv-10440**

**vs.**                                  **Hon. Gerald E. Rosen**

**CARL J. SCHMIDT, M.D., M.P.H.,
EVIN FOBBS, LEVIA DAVIS, LORITA
PRENTICE, J. SCOTT SOMMERSET, M.D.,
Ph.D., OFFICE OF THE WAYNE COUNTY
MEDICAL EXAMINER, CHARTER COUNTY
OF WAYNE, and GENERATIONS FUNERAL
AND CREMATION SERVICES, INC.,**

              **Defendants.**

_____/

### OPINION AND ORDER REGARDING DEFENDANTS'
### MOTION FOR SUMMARY JUDGMENT

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on  October 07, 2014

PRESENT:  Honorable Gerald E. Rosen
United States District Chief Judge

## *I. INTRODUCTION*

On October 26, 2012, Plaintiff Mary Badder commenced this § 1983/gross

negligence lawsuit in state court naming as defendants Wayne County, the Office of the

Wayne County Medical Examiner, several employees of the Medical Examiner's Office,

and Generations Funeral and Cremation Services, Inc.  The claims asserted by Plaintiff

1

Badder arise out of the death of her 43-year-old daughter, Kelly Phillips, who was found in a home in Detroit dead of a drug overdose on November 7, 2009. Defendants removed the case to this court on February 4, 2013 based on Plaintiff's assertion of a claim arising under a federal statute. After the close of discovery, on November 27, 2013, Wayne County and three individual Defendants -- Wayne County Chief Medical Examiner Carl Schmidt, and two of the Medical Examiner's Office investigators, Evin Fobbs and Levia Davis -- filed the present motion for summary judgment.[1]

Having reviewed the parties' briefs and the entire record of this matter, the Court finds that the pertinent allegations and legal arguments are sufficiently addressed in these materials and that oral argument would not significantly assist in the resolution of this motion. Accordingly, the Court will decide Defendant's motion "on the briefs." See L.R. 7.1(f)(2). This Opinion and Order sets forth the Court's ruling.

## II. FACTUAL BACKGROUND

Plaintiff Mary Badder is the mother Kelly Phillips, deceased. Kelly Phillips had a long history of drug abuse. Until shortly before her death, Phillips had been living in her mother's home in Westland, Michigan. Because her daughter had been in rehab, Ms. Badder believed Phillips had quit using drugs. However, approximately three weeks

---

[1] Movants are the only remaining defendants in this action. All of the other named-defendants have been dismissed. [*See* Stipulated Order for Dismissal of Generations Funeral and Cremation Services, Dkt. # 21; Stipulated Order to Dismiss Defendants Lorita Prentice, J. Scott Somerset and Wayne County Medical Examiner's Office, Dkt. # 26.

2

prior to her daughter's death, Plaintiff learned that Phillips had resumed using drugs. An argument ensued between mother and daughter which culminated in Phillips moving out of her mother's house.  At her daughter's request, Plaintiff dropped Phillips off near a home in Detroit's Brightmoor area.   Plaintiff did not ask her daughter where she was going to live.  She admitted, however, that she was fully aware that her daughter was returning to a life on drugs.  [*See* Plaintiff's Dep., pp. 39-43].

The day before her death, Phillips went to her mother's house to get money that had been deposited into her checking account.  *Id.*  Phillips told her mother that  day that she was living in a half-way house in Dearborn Heights.  After spending some time together, Plaintiff drove her daughter to a shopping center near the half-way house where Phillips wanted to do some shopping before she had to report back to the half-way house for the night.  Phillips was to call her mother once she arrived back at the half-way house, but she never did.

Though Plaintiff never received the call her daughter had promised, she testified she was not concerned; she assumed her daughter had reported back to the half-way house late and had gotten into trouble for it. *Id*. at p. 41.  Plaintiff admitted she never filed a missing person's report when she had not heard from her daughter for more than a week even though she learned that the purported half-way house was in fact, not a half-way house but a private residential dwelling.  *Id.* pp. 46-47, 50-52.

On November 7, 2009, the occupant of a house on Bramell Street in the City of Detroit called the police to report that she had found Kelly Phillips unresponsive in one

3

of the rooms of the home.  The Detroit Police came to the scene, and after determining that Phillips was dead, notified the Wayne County Medical Examiner's Office ("WCMEO") .

The WCMEO dispatched investigator Levia Davis to the location. Upon arrival, investigator Davis identified Phillips with the assistance of one of Phillips' friends, Sandra Cryor.  Cryor was the person who had called the police earlier that night. Defendant Davis searched the body and found a wallet which contained a Michigan-issued identification card.  She then directed that the body be taken to the Medical Examiner's Office.  Davis brought decedent's wallet and its contents back to the office to be processed, packaged and logged into the property book so that it could be returned to the decedent's next of kin.

The following day, November 8, 2009, WCMEO investigator Evin Fobbs, assumed responsibility for Phillips' case and the responsibility of notifying the decedent's next of kin.  Fobbs' testified that, although he had no specific recollection, he was certain that he had searched Phillips' wallet because his regular procedure was to search for a driver's license or any paper in a decedent's belongings that might lead to the identification of next of kin.  [Fobbs Dep., pp. 17-18].

Unable to locate any next of kin information in Phillips' wallet, Fobbs called Phillips' friend, Sandra Cryor, who had called police about Phillips, and left a message for her to contact him. That same day, Dr. J. Scott Somerset, an Assistant Wayne County Medical Examiner, performed an autopsy on Kelly Philips and determined that the cause

4

of Phillips' death was acute cocaine and heroin intoxication.

Four days later, on November 12, 2009, Fobbs made a second attempt to identify any next of kin information and again tried to reach Sandra Cryor, as she was the only lead he had at the time. This time he was successful in reaching her.  Cryor, however, indicated that she had only known Phillips for a short time and had no next of kin information.  However, she promised that she would contact Fobbs with any information she might come upon.

Three weeks passed and Fobbs had not heard back from Cryor with any information on Phillips' next of kin.  Therefore, on December 4, 2009, Fobbs once again contacted Cryor, but Cryor still had no information about Phillips' relatives.

At that point, Fobbs decided to start again from scratch by re-examining Phillips' wallet.  It was in this second search of the decedent's wallet that Fobbs discovered a piece of paper that had been folded into a tiny square, no more than one-half inch in size, that was tucked into a corner of the wallet.  [*See* Fobbs' Dep., p. 45.]  On this piece of paper were the names "Mary Badder" and "Dennis DeCarlo," and two telephone numbers.  *Id.* at p. 33.

Fobbs called the number for Mary Badder first, as it was the first one written on the paper, and left a message.  He then he called Dennis DeCarlo.  DeCarlo answered Fobbs' call and informed Fobbs that Mary Badder was Phillips' mother. After his conversation with DeCarlo, Fobbs received a return phone call from Mary Badder. Fobbs informed Ms. Badder of her daughter's death.

Later that day, December 4, 2009, Badder went to the Medical Examiner's Office, confirmed her daughter's identity by looking at a photo, and signed an authorization for Generations Funeral Home to take custody of her daughter' body for burial.  According to Badder's deposition testimony, when she asked the funeral director while making arrangements for her daughter's funeral if an open casket ceremony for her daughter was possible, she was told by the funeral director that she should "remember her as she was." [Plaintiff's Dep., p. 73.]  Although she never saw the body, Plaintiff contends that her daughter's body was decomposed to such an extent that she was forced to cremate her instead of having a natural burial, which is what she would have preferred.

On October 26, 2012, Plaintiff filed the instant lawsuit.  In Count I of her four-count Complaint, Plaintiff asserts a state common law claim of gross negligence against the individual WCMEO defendants based on the allegation that these defendants failed to ascertain Plaintiff's identity as Phillips' next of kin and notify her of her daughter's death within a reasonable time after the WCMEO took custody and control of the body.

Count II of Plaintiff's Complaint sets forth Plaintiff's lone federal claim:  her claim of violation of 42 U.S.C. § 1983.  In this Count, Plaintiff claims that the individual WCMEO employees, "individually and while in the course and scope of their employment," deprived her of her constitutional due process right to her daughter's body.  Specifically, Plaintiff alleges a constitutional possessory right to the prompt delivery of her daughter's body for proper burial and that by not identifying her as Phillips' next of kin until after her daughter's body had been in their custody for 3 ½ weeks, Defendants

violated that right.  Plaintiff also predicates the violation of her due process right on the County Medical Examiner's alleged negligent hiring/failure to train/failure to supervise WCMEO employees.  *See* Complaint, ¶¶ 33 (d); 33(e); 33(l).

In Count III, Plaintiff asserts a claim of vicarious liability against the Wayne County Medical Examiner's Office and Wayne County claiming that the County and the WCMEO are vicariously liable for injuries and damages caused by the individual defendants.

Finally, Count IV of the Complaint is Plaintiff's claim for unlawful mishandling of Kelly Phillips' body in violation of her Michigan statutory right to possess and control her daughter's body pursuant to M.C.L. §§ 52.205(4) and (6), and 700.3206(1), and her common law right to bury Phillips's body without mutilation.[2]

### III. DISCUSSION

#### A. STANDARDS APPLICABLE TO MOTIONS FOR SUMMARY JUDGMENT

Summary judgment is proper if the moving party "shows that there is no genuine

---

[2]  M.C.L. § 52.205 sets forth the duties of a county medical examiner.  Subsection (4) provides "the county medical examiner shall ascertain the identity of the decedent and immediately and as compassionately as possible notify the next of kin of the decedent's death and the location of the body."  Subsection (6) provides that the medical examiner "shall promptly deliver or return the body or any portion of the body to relatives or representatives of the decedent after examination or autopsy."  Section 3206 of the Estates and Protected Individuals Code, M.C.L. § 700.3206(1), provides that an individual related to a decedent "is presumed to have the right and power to make decisions about funeral arrangements and the handling, disposition, or disinterment of a decedent's body, including, but not limited to, decisions about cremation, and the right to possess cremated remains of the decedent."

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). As the Supreme Court has explained, "the plain language of Rule 56[ ] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). In addition, where a moving party -- here, Wayne County -- seeks an award of summary judgment in its favor on a claim or issue as to which it bears the burden of proof at trial, this party's "showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Calderone v. United States,* 799 F.2d 254, 259 (6th Cir.1986) (internal quotation marks, citation, and emphasis omitted).

In deciding a motion brought under Rule 56, the Court must view the evidence in a light most favorable to the nonmoving party. *Pack v. Damon Corp.,* 434 F.3d 810, 813 (6th Cir.2006). Yet, the nonmoving party may not rely on mere allegations or denials, but must "cit[e] to particular parts of materials in the record" as establishing that one or more material facts are "genuinely disputed." Fed.R.Civ.P. 56(c)(1). But, "the mere existence of a scintilla of evidence that supports the nonmoving party's claims is insufficient to defeat summary judgment." *Pack,* 434 F.3d at 814 (alteration, internal quotation marks, and citation omitted).

Further, while the nonmoving party must "cit[e] to particular parts of materials in

8

the record" as establishing that one or more material facts are "genuinely disputed[,]"
Fed.R.Civ.P. 56(c) (1), the Court may consider materials on the record not cited by the
parties. Fed.R.Civ.P. 56(c)(3) ( "The court need consider only the cited materials, but it
may consider other materials in the record."). "Ultimately a district court must determine
whether the record *as a whole* presents a genuine issue of material fact." *United States v.
Hodge,* 11–10711, 2011 WL 3472788 (E.D.Mich. Aug.9, 2011) (unreported) (emphasis
added). The Court will apply the foregoing standards in deciding the motion for summary
judgment in this case.

Because the Court's jurisdiction is predicated upon Plaintiff's Section 1983 claim
for violation of a constitutional right, the Court will examine the federal claim first.

**B.     PLAINTIFF'S SECTION 1983 CLAIM FOR VIOLATION OF HER
        PROCEDURAL DUE PROCESS UNDER THE FOURTEENTH
        AMENDMENT**

Section 1983 serves as a vehicle to obtain damages caused by persons acting under
color of state law whose conduct violates the U.S. Constitution or federal laws. *Waeschle
v. Dragovic*, 576 F.3d 539, 543 (6th Cir. 2009), *cert. denied*, 559 U.S. 1037 (2010).
Plaintiff here asserts a procedural due process claim.  Specifically, Plaintiff claims that by
retaining custody of her daughter's body for 3 1/2 weeks before notifying Plaintiff of her
daughter's death, the Defendants denied her the possessory right to her daughter's body
for burial in the state it was at the time of death in violation of the Due Process Clause of
the Fourteenth Amendment.

9

The Due Process Clause of the Fourteenth Amendment prohibits states from depriving "any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. "In order to establish a procedural due process claim, a plaintiff must show that (1) he had a life, liberty, or property interest protected by the Due Process Clause; (2) he was deprived of this protected interest; and (3) the state did not afford him adequate procedural rights prior to depriving him of the property interest." *Women's Med. Prof'l Corp. v. Baird,* 438 F.3d 595, 611 (6th Cir.2006) (citation omitted).

Property interests "are defined by existing rules or understandings that stem from an independent source such as state law rules." *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). "Although property rights are principally created by state law, whether a substantive interest created by the state rises to the level of a constitutionally protected property interest is a question of federal constitutional law. . . . The due process clause only protects those interests to which one has a legitimate claim of entitlement." *Waeschle v. Dragovic*, 576 F.3d at 544-45.

Plaintiff here contends that Michigan law provides next of kin a constitutionally protected property interest in the remains of a deceased family member for burial, and that as a result of Defendants' failure to identify her as Phillips' next of kin and notify her of daughter's death until 3 ½ weeks after she died, her constitutional right to procedural due process was violated because by the time she was notified, her daughter's body was so decomposed that she had to cremate the body rather than have a proper burial.

10

While Defendants acknowledge that Michigan recognizes that next of kin have a right to have the body of a family member delivered to him/her for burial, Defendants contend that because it is undisputed that Kelly Phillips' body was, in fact, delivered to Plaintiff intact, Plaintiff cannot make out a Section 1983 claim. Defendants argue that Michigan law makes a distinction between mutilation and decomposition of a dead body. Specifically, Defendants argue that while Michigan courts have held that a cause of action will lie for the mutilation of a dead body, and the Sixth Circuit has recognized the procedural due process right of next of kin to possess a family member's body for burial and prevent its mutilation, the same is not true for the decomposition of a body. Because Plaintiff's only complaint here arises from the purported delay in delivering Kelly Phillips' body to her which allegedly resulted in its decomposition, Defendants argue that Plaintiff cannot establish a violation of a cognizable constitutional right.

Additionally, Defendants posit, assuming *arguendo* Plaintiff has demonstrated violation of a constitutional right, that right was not clearly-established at the time of the events complained of and, therefore, they are cloaked with qualified immunity.

## C. QUALIFIED IMMUNITY

 "A law enforcement officer's key defense to a § 1983 action is encapsulated in the concept of qualified immunity." *Drogosch v. Metcalf,* 557 F.3d 372, 377 (6th Cir. 2009). Qualified immunity shields public officials who perform discretionary functions from the necessity of defending against tort liability so long as their conduct does not violate clearly established rights of which a reasonable official would have known. *See*

*Fisher v. Harden,* 398 F.3d 837, 842 (6th Cir.), *cert. denied¸* 546 U.S. 1075 (2005). The doctrine is designed to "avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). It protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986). Qualified immunity is an affirmative defense; once asserted, the "burden of proof is on the plaintiff to show that the defendant[s][are] not entitled to qualified immunity." *Armstrong v. City of Melvindale,* 432 F.3d 695 (6th Cir.2006) (citing *Sheets v. Mullins,* 287 F.3d 581, 586 (6th cir.2002)).

Federal courts are required to conduct the qualified immunity analysis by using the two-step inquiry set forth in *Saucier v. Katz.* 533 U.S. 194, 121 S.Ct. 2151 (2001). The first step of the inquiry requires courts to determine "whether the facts that a plaintiff has alleged ... or shown ... make out a violation of a constitutional right." *Pearson v. Callahan,* 555 U.S. 223, 232, 120 S.Ct. 808, 816 (2009) (citations omitted). If the plaintiff satisfies the first step, the court then "must decide whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Ashcroft v. al-Kidd,* 563 U.S. ___, 131 S.Ct. 2074, 2080 (2011). Qualified immunity is applicable unless the official's conduct violated a clearly established constitutional right." *Pearson,* 555 U.S. at 232, 120 S.Ct. at 816.

However, the sequential *Saucier* protocol is not mandatory. *Pearson, supra*, 555 U.S. at 236. The *Pearson* Court reasoned that "[t]he procedure sometimes results in a

12

substantial expenditure of scarce judicial resources on difficult questions that have no effect on the outcome of the case.  There are cases in which it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right." *Id.*  Thus, it is within the discretion of the district court to determine the sequence in which to address the two prongs of qualified immunity.  *Id.*; *see also Grawey v. Drury,* 567 F.3d 302, 309 (6th Cir.2009).

Guided by the foregoing authorities, the Court will address first the issue of whether the right at issue was clearly-established at the time of the events giving rise to this action.  *See Hagans v. Franklin County Sheriff's Office,* 695 F.3d 505, 508 (6th Cir. 2012) ("The first question [whether defendant violated plaintiff's constitutional rights] raises some complications.  The second does not.  We opt to answer the easier of the two questions, saving the harder one for another day." *Id.*).

## C.  *CLEARLY ESTABLISHED CONSTITUTIONAL RIGHTS*

The Sixth Circuit has clarified that "[f]or a right to be 'clearly established,' the contours of the right must be sufficiently clear that a reasonable official would understand that his or her conduct violates that right. The unlawfulness of the official or employee's conduct must be apparent in light of pre-existing law." *Durham v. Nu'Man*, 97 F.3d 862, 866 (6th Cir.1996), *cert. denied*, 520 U.S. 1157 (1997). "A right is not considered clearly established unless it has been authoritatively decided by the United States Supreme Court, the Court of Appeals, or the highest court of the state in which the alleged constitutional violation occurred." *Id.*  A right is clearly-established only if

13

"'existing precedent [has] placed the …constitutional question beyond debate.'" *Reichle v. Howards,* ___ U.S. ___, 132 S.Ct. 2088, 2193 (2012) (quoting *Ashcroft v. al-Kidd.* 563 U.S. at ___, 131 S.Ct. at 2083). Because the focus is on whether the official had fair notice that his or her conduct was unlawful, it is the law at the time of the conduct that must be examined. *Brosseau v. Hogan*, 543 U.S. 194, 194, 124 S.Ct. 596, 599 (2004). "If the law at that time did not clearly establish that the officer's conduct would violate the Constitution, the officer should not be subject to liability or, indeed, even the burdens of litigation." *Id.*

In deciding whether a right has been clearly established, the Supreme Court has repeatedly warned lower courts not to define the right at "a high level of generality." *Ashcroft v. al-Kidd*, 563 U.S. ___, 131 S.Ct. at 2084; *Hagans v. Franklin County Sheriff's Office*, 695 F.3d at 508. Rather, "this inquiry 'must be undertaken in light of the specific context of the case.'" *Brosseau,* 543 U.S. at 198, 124 S.Ct. at 599 (quoting *Saucier*, 533 U.S. at 201).

Plaintiff here asserts a constitutional right to the possession of her daughter's body for burial in the state it was at the time of death, and claims that Defendants violated this right by their tardy identification of her as next of kin, thereby delaying the delivery of the body to her, and resulted in the body's decomposition. Therefore, the focus of the Court's analysis turns to ascertaining whether Plaintiff's asserted right was clearly established as of November 2009.

14

In support of her claim of a clearly-established constitutional right, Plaintiff relies upon *Whaley v. County of Tuscola*, 58 F.3d 1111 (6th Cir. 1995), *cert. denied,* 516 U.S. 975 (1995). The plaintiffs in *Whaley*, next of kin of deceased persons, brought § 1983 actions against a pathologist and his assistant claiming violation of their Fourteenth Amendment procedural due process rights when, without obtaining their permission, the defendants removed the corneas or eyeballs of their deceased relatives during autopsies. The defendant pathologist, Dr. Hines, was employed under contract to perform autopsies for the Saginaw and Tuscola County Medical Examiners. Hines' assistant, Armando Herrera, was a certified "enucleator," having the ability to remove eyes and corneas without damaging them. *Id*. at 1113. Herrera also owned an eye bank and tissue center. *Id*. The counties entered into an agreement pursuant to which the Herrera was allowed to remove a decedent's corneas without the consent of the next of kin. *Id*. In return, Herrera, who stood to profit from selling the corneas, agreed to bear all of the counties' expenses in performing the autopsies whenever corneas were removed, and half those expenses when they were not. *Id.* Once the practice was discovered, the plaintiffs filed suit claiming violations of their Fourteenth Amendment right to due process when defendants removed decedents' eyeballs and corneas without next of kin's consent. *Id*.

The district court dismissed the case under Fed. R. Civ. P.12(b)(6) for failure to state a claim. The plaintiffs appealed to the Sixth Circuit, and the appellate court reversed.

15

The Sixth Circuit began its analysis by ascertaining the contours of the Fourteenth Amendment right relied upon by the plaintiffs. Noting that the Fourteenth Amendment only prohibits states from depriving a person of life, liberty, or property without due process of law, U.S. Const. amend. XIV, § 1, the court observed that to make out a claim of violation of due process, the plaintiffs had to establish that the defendants infringed on the life, liberty, or property of the plaintiffs. The court determined that the case dealt with the "property" portion of due process clause, i.e., whether the next of kin had a property interest in the body, including the eyes, of a deceased relative. 58 F.3d at 1113.

The court further explained,

> The existence of a property interest for due process purposes depends in large part on state law. According to the Supreme Court:

>> Property interests, of course, are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law-rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.

> *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). Also, "property" interests subject to procedural due process are not limited by a few rigid, technical forms. Rather, "property" denotes a broad range of interests that are secured by existing rules or understandings. . . .These rules and understandings may in turn create a legitimate claim of entitlement, worthy of due process protection. . . . Finally, whether a substantive interest created by the state rises to the level of a constitutionally protected property interest is a question of federal constitutional law. . . . In making this determination, courts must look beyond the law's nomenclature and to its substance.

58 F.3d at 1113-14 (some citations and internal punctuation omitted).

16

The court, therefore, turned to Michigan law, and citing *Doxtator v. Chicago & W. Mich. R.R.*, 120 Mich. 596, 597, 79 N.W. 922 (1899); *Keyes v. Konkel*, 119 Mich. 550, 551, 78 N.W. 649 (1899); and *Deeg v. City of Detroit*, 345 Mich. 371, 376, 76 N.W.2d 16 (1956), noted that "[t]he Michigan Supreme Court has repeatedly held that the next of kin '[are] entitled to possession of the body as it is when death comes, and that it is an actionable wrong for another to interfere with that right by withholding the body or mutilating it in any way.'" *Id.* at 1115 (quoting *Doxtator v. Chicago & W. Mich. R.R.*, 120 Mich. 596, 597, 79 N.W. 922 (1899).[3] The court also noted that Michigan's

---

[3] *Doxtator* was a suit brought by the wife of a railroad worker who died after his legs were run over by several railroad cars and had to be amputated. When his body was given over to his wife without the amputated legs, which had been cremated, the wife brought suit claiming that because the doctors had assumed a duty to care for him while he was living, they also had a duty to turn over the whole of his remains – including his severed limbs – when he died. It was in this context of delivery of only a part of the decedent body that the Michigan Supreme Court acknowledged that

> it has been held in a number of well-considered American cases that the one whose duty it is to care for the body of the deceased is entitled to possession of the body, as it is when death comes, and that it is an actionable wrong for another to interfere with that right by withholding the body or mutilating it in any way. *Larson v. Chase*, 47 Minn. 307, 50 N. W. 238; *Foley v. Phelps* (Sup.) 37 N. Y. Supp. 471; *Burney v. Hospital* (Mass.) 47 N. E. 401; 8 Am. & Eng. Enc. Law (2d Ed.) 834.

*Id.,* 120 Mich. at 597, 79 N.W. at 922-23.

In *Keyes v. Konkel,* the deceased died at a hospital. The hospital authorities turned the body over to undertakers. After the undertakers had performed some services in fitting the body for burial, the decedent's brother demanded possession of the body, but

Anatomical Gift Act gives the next of kin the choice of making a gift of all or part of a decedent's body. *Id.* at 1116.

Summarizing the foregoing, the court found that, under Michigan law "[t]he next of kin have the right to dispose of the body in limited circumstances, possess the body for burial, and prevent its mutilation," *id.,* and, therefore, the court concluded that "Michigan provides the next of kin with a legitimate claim of entitlement and thus a property interest in a dead relative's body, including the eyes." *Id.* at 1117.

The reach of *Whaley,* however, was subsequently tested in *Waeschle v. Dragovic,* 576 F.3d 539 (6th Cir. 2009), *cert. denied,* 559 U.S. 1037 (2010). *Waeschle* arose out of the death of a nursing home resident and the subsequent autopsy performed at the request of the police department to investigate the circumstances of decedent's death. The

---

the undertakers refused to deliver the body up unless paid for their services. The brother brought an action in replevin. Though the court acknowledged that

> [i]n certain modern American cases, a dead body has been said to be a quasi property, and the right to control and bury it, and to recover against one who mutilates the corpse, has been maintained. Pierce v. Cemetery, supra; Weld v. Walker, supra; Burney v. Hospital (Mass.) 47 N. E. 401; Larson v. Chase (Minn.) 50 N. W. 238; Foley v. Phelps (Sup.) 37 N. Y. Supp. 471[,]

because there is no property right in a dead body, the court determined that an action of replevin would not lie. 119 Mich. at 551.

> Similarly, in *Deeg v. Detroit,* the court acknowledged that "[i]t seems to be settled by the great weight of authority that the unlawful and intentional mutilation of a dead body gives rise to a cause of action on behalf of the person or persons entitled to the possession, control, and burial of such body," but held that the cause of action did not survive the next of kin's death. 345 Mich. at 376.

18

medical examiner removed the decedent's brain for study as part of the autopsy for clues regarding the cause of death. *Id*. at 542. At the completion of the autopsy the medical examiner incinerated the brain as medical waste. *Id*.

The decedent's daughter filed a lawsuit against Oakland County and the county medical examiner, alleging that by depriving her of the opportunity to properly bury or cremate her mother's brain, her Fourteenth Amendment due process rights had been violated. *Id*. The plaintiff argued that the reasoning of the court in *Whaley* controlled her case -- she argued, in essence, that her mother's brain should be no less constitutionally protected than are eyes or corneas. *Id*. at 546.

Both Oakland County and the county medical examiner moved for summary judgment arguing that Waeschle had no constitutionally protected property right to possess her deceased mother's brain because it had been removed for forensic examination. *Id*. at 542. The medical examiner also asserted a qualified immunity defense. *Id*.

Relying on *Whaley,* the district court determined that Waeschle had established that she had a quasi-property interest in her mother's brain and that the medical examiner deprived her of that interest, *id*. at 543, and also determined that the medical examiner was not entitled to qualified immunity because the quasi-property interest was "clearly established" and the medical examiner "reasonably should have known" that he was violating Waeschle's Fourteenth Amendment right when he did not return the brain to the decedent's daughter. *Id*.

19

The Sixth Circuit reversed. The court explained that whereas *Whaley* involved the unauthorized removal of eyes and corneas for private profit, serving no investigative purpose, the decedent's brain in *Waeschle* was removed and retained for study by the medical examiner in furtherance of a lawful criminal investigation. *Id*. at 547. "The distinction is important because Waeschle might have no right under Michigan law to possess, control, or dispose of her mother's brain once it is removed for legitimate forensic study." *Id.*

By declining to extend the reasoning in *Whaley* to the plaintiff's case in *Waeschle*, the court signaled the likelihood that the contours of a federal constitutional right to possess the remains of a relative will be determined by the particular circumstances presented in each case.

The principal holding of the case, however, was the court's determination that Waeschle's alleged constitutional right was not clearly-established. The court explained:

> Michigan law regarding the rights of next of kin in their relative's body parts removed for forensic examination during an autopsy is at best equivocal. Not a single case instructed Dragovic to treat the brain in any manner other than the way he did. Nor did any Michigan statute unambiguously instruct Dragovic on how to dispose of individual body parts retained for forensic examination as opposed to dealing with the body as a whole.

> Waeschle's alleged constitutionally protected property right to her mother's brain is therefore not clearly established because the underlying state-created property interest is not "sufficiently clear that a reasonable official would understand that what he is doing violates that right." For that reason, Dragovic is entitled to summary judgment on the basis of qualified immunity.

*Id.* at 550 (citations omitted).

20

The court, however, declined to make an affirmative ruling as to the state-law aspect of Waeschle's due process claim and explained that it was only holding that Michigan law as developed as of the date of its opinion [i.e., August 14, 2009] did not clearly recognize the custodial right to her mother's brain that Waeschle was asserting. *Id.*

> [W]hether to recognize such a right is a task that the Michigan legislature and courts are better equipped to handle than this court which is why we are exercising our discretion under *Pearson* to not further explore the first prong of the qualified-immunity test as set forth in *Saucier v. Katz*, 522 U.S. 194, 11 S.Ct. 2151, 150 L.Ed. 2d 272 (2001).

*Id.*

Therefore, the court remanded the case, with instructions, directing the district court to grant the medical examiner's motion for summary judgment with respect Waeschle's § 1983 individual-capacity claim and to grant Oakland County's motion to certify the question to the Michigan Supreme Court. *Id.* at 551.

The Michigan Supreme Court subsequently answered the certified question in the negative: "[T]he decedent's next of kin does not have a right under Michigan law to possess the brain in order to properly bury or cremate the same after the brain is no longer needed for forensic examination." *See In re Certified Question from U.S. District Court for Eastern District of Michigan,* 488 Mich. 1, 3, 793 N.W.2d 560, 561 (2010). The Court relied on both Michigan statutory and case law in coming to this conclusion:

> At all times relevant to the underlying federal district court case, this issue was governed by MCL 52.205(5). This statute provided:

21

The county medical examiner shall, after any required examination or autopsy, promptly deliver or return the body to relatives ... except that the medical examiner may retain, as long as may be necessary, any portion of the body believed by the medical examiner to be necessary for the detection of any crime.

Because the statute required only prompt return of "the body" -- and because it permitted the medical examiner to retain portions of the body in order to detect crime -- this law provided next of kin no clear right to the return of a brain lawfully removed and retained for forensic examination after the body was returned to the decedent's family for burial or cremation. Further, plaintiff has not disputed defendants' assertions that there was an historical practice of retaining, examining, and later disposing of an examined brain when MCL 52.205 was enacted in 1953 and that medical examiners promulgated rules to permit this practice under MCL 52.201c. Finally, no Michigan case law gives next of kin a possessory right to a decedent's brain following a lawful forensic examination.

488 Mich. at 3-4, 793 N.W. 2d at 561-62.[4]

As illustrated both by *Whaley* and *Waeschle,* the Sixth Circuit's jurisprudence

regarding a next of kin's right to a decedent's body at best recognizes a limited

_____

[4] The Court noted that M.C.L. § 52.205 was amended after the *Waeschle* had been decided and now requires the medical examiner to return the body *or any portion of the body* to a decedents relatives or representatives after an autopsy, *see* M.C.L. § 52.205(6), but expressed no view as to whether the plaintiff in *Waeschle* would have had any right to her mother's brain under the amended statute. 488 Mich. at 4 n.4, 793 N.W.2d at 561 n.4.

Following the Michigan Supreme Court's ruling on the certified question, on Oakland County's motion for summary judgment, the district court determined that, based on the holding by the Michigan Supreme Court, "there is no state property right on which Plaintiff can base her 42 U.S.C. § 1983 claim." *See Waeschle v. Dragovic*, 2011 WL 1100027 at *3 (E.D. Mich. Mar. 24, 2011). Therefore, the court concluded that that the county was entitled to judgment as a matter of law, *id.,* and the Sixth Circuit affirmed. *See Waeschle v. Dragovic*, 687 F.3d 292 (6th Cir. 2012).

22

constitutionally protected property interest in a decedent's remains.  Plaintiff, however, asserts a different right from the right to possess her daughter's body and all of its parts.

Plaintiff contends that her right to her daughter's body was violated *because it was not preserved in the state it was at the time of death* due to the failure of WCMEO employees to promptly identify her as the decedent's next of kin. Such a property right has never been recognized by the Michigan Supreme Court or Sixth Circuit Court of Appeals, and certainly was not recognized at the time of the events giving rise to this action in November - December 2009.

The closest Sixth Circuit case addressing the timeliness of a medical examiner's actions is an unpublished decision that involved a procedural due process claim based on Michigan's statutory requirement that the medical examiner use "diligent efforts" to notify the next of kin of a decision to perform an autopsy.  *See Montgomery v. County of Clinton, Mich.*, 940 F.2d 661, 1991 WL 153071 (6th Cir. 1991).  That case arose out of the death of a sixteen-year-old in a high speed chase by the police.  Although the parents were notified of their son's death, they were not notified of the autopsy ordered by the medical examiner.  On appeal from the district court's grant of summary judgment, the Sixth Circuit held that there was no merit in the procedural due process claim founded on the state statutory requirement in M.C.L. § 52.205(4) that the medical examiner make a diligent effort to notify the next of kin as to the decision to perform an autopsy.

> Whatever the nature of the right created by the statute there is an insufficient liberty or property interest under this statute to create a valid procedural due

process claim. Although the notice requirement in the state statute does not appear to be discretionary, it does not purport to establish a right to control the dead body.

1991 WL 153071 at *2.[5]

*Montgomery* suggests that M.C.L. § 52.205(4) should be similarly construed in this case with respect to the purported delay in notifying Plaintiff, as Kelly Phillips' next of kin, of the death of her daughter.

Plaintiff also relies upon *Dampier v. Grace Hospital*, 233 Mich. App. 714, 592 N.W.2d 809 (1999), as evidence of the violation of a clearly-established right.  In *Dampier,* the Michigan Court of Appeals opined that the plaintiffs in that case might have been able to present a claim cognizable under the Fourteenth Amendment based on the mishandling of the decedent's body which resulted in its decomposition had the trial court allowed them to file a second amended complaint.  That case arose following the

───────────────────

[5] At the time of the *Montgomery* decision, M.C.L. § 52.205(4) provided:

> The medical examiner shall ascertain the identity of the deceased and notify immediately as compassionately as possible the next of kin of the death and the location of the body except that such notification is not required if a person from the state police or a county sheriff department or a township police department or a municipal police department states to the medical examiner that the notification has already occurred. The county medical examiner may conduct an autopsy if he or she determines that an autopsy reasonably appears to be required pursuant to law. <u>After the county medical examiner or a deputy or a person from the state police or a county sheriff department or a township police department or a municipal police department has made diligent effort to locate and notify the next of kin, he or she may order and conduct the autopsy with or without the consent of the next of kin of the deceased.</u>

M.C.L. § 52.205(4) (emphasis added).

24

death of William Dampier.  Dampier was transported to Grace Hospital in Detroit after suffering a heart attack.  He was pronounced dead shortly after his arrival at the hospital. Plaintiff Johnnie Dampier, his wife, requested an autopsy to determine the exact cause of death.  The body was kept in the care, custody, and control of Grace Hospital, which thereafter entrusted it to the Wayne County Medical Examiner.  Wayne County, in turn, entrusted the remains to Stinson Funeral Home.  Stinson permitted Plaintiff to view her husband's body whereupon she discovered that it had been allowed to decompose to a "ghastly and grotesque sight."  233 Mich. App. at 718.

Dampier's wife and children thereafter brought suit in Wayne County Circuit Court for negligence, intentional infliction of emotional distress, breach of contract and violation of the Michigan Constitution.  The trial court granted Wayne County's motion for summary disposition and dismissed the plaintiffs' claims against the other defendants without prejudice.  The trial court also denied the plaintiffs' motion for leave to file a second amended complaint but failed to state its reasons for doing so.

The plaintiffs appealed to the Michigan Court of Appeals which held that Wayne County was protected by state law governmental immunity on the tort and contract claims, and held that the plaintiffs' constitutional claim under the Michigan Constitution failed because, in Michigan, "there is no property right in the next of kin to a dead body." *Id.* at 731 (quoting *Tillman v. Detroit Receiving Hospital*, 138 Mich. App. 683, 686-87, 360 N.W.2d 275 (1984)). The court further noted that in *Tillman* it previously held that "the common law right of burial of a deceased person without mutilation, is not of

25

constitutional dimension." *Id.* Accordingly, the appellate court affirmed the trial court's grant of summary disposition in favor of the county.

However, the court reversed the trial court's denial of the plaintiffs' motion for leave to file a second amended complaint finding that the plaintiffs' proposed amendment to assert a claim for violation of the Fourteenth Amendment of the U.S. Constitution was not futile. The court reasoned that "the discussions by the federal district court and circuit court concerning the nature of the claim indicate that federal law would recognize a claim based on the mishandling of a decedent's remains as a result of which the remains decompose." *Id.* at pp. 736-37. Specifically, the court relied on *Whaley* and the cases cited therein in concluding that the plaintiffs could have presented a claim cognizable under the Fourteenth Amendment had they been permitted to amend their complaint. *Id.* at 736 n.3.

However, *Dampier* was decided before the Sixth Circuit's decision in *Waeschle* in which the federal appellate court not only noted that the important "intentional mutilation" feature of *Whaley* but also found that the Michigan law in this area was not clearly established.

Moreover, the *Dampier* decision itself is internally inconsistent. In affirming the dismissal of the plaintiffs' state constitutional claim, the *Dampier* court expressly held that "a cognizable claim for the mutilation of a dead body is not sufficiently broad to encompass a claim for its decomposition, which does not involve the active incision, dismemberment, or evisceration of the body." *Dampier* at 729. The distinction between

26

decomposition and mutilation was again highlighted by the court in its discussion of whether the plaintiffs could make out a cognizable federal claim where the court clearly noted that it was an entirely different set of circumstances from those presented in *Dampier* that gave rise to the federal court's decision in *Whaley*:

> *Whaley* involved claims based on the removal of the plaintiffs' decedents' corneas without the plaintiffs' consent.  In contrast, in the present case, no actual invasion of William Dampier's body occurred, and Wayne County did not prevent plaintiffs from obtaining his body or any of its parts.

233 Mich. App. at 819.

Despite its acknowledgment of this distinction, the *Dampier* court nevertheless summarily concluded that pursuant to *Whaley*, "federal law would recognize a claim based on the mishandling of a decedent's remains as a result of which the remains decompose." 233 Mich. App. at 819 and n.3.

In light of *Dampier's* lack of a reasoned analysis and the court's internal inconsistencies, coupled with the fact that the *Dampier* court did not have the benefit of federal decisions subsequent to *Whaley*, the Court concludes that *Dampier* does not aide Plaintiff here in establishing the right she claims to have been violated was clearly established.

The Court also finds Plaintiff's reliance on the Michigan decisions cited in *Whaley* to demonstrate a clearly-established possessory right to a decedent's body in the state it was at the time of death to be no more availing than cases discussed above as the Michigan cases Plaintiff relies upon only illustrate the existence of a right to possess the

body for burial and prevent its mutilation. *See* discussion in n. 3, *supra*. None of the cases address the delivery of a decedent's remains that had decomposed as a result of an alleged delay in notifying next of kin of the decedent's death.

In sum, based on a review of both Sixth Circuit and Michigan jurisprudence, the Court finds that no clearly-established constitutional right was violated by Defendants' delay in notifying Mary Badder of her daughter's death. No case law instructed the Defendants to ascertain Kelly Phillips' next of kin any differently than they did or to take any additional measures in their efforts. At the same time no Michigan statute provided any instructions beyond the steps Defendants took in identifying and notifying Kelly Phillips' next of kin. Badder's alleged constitutionally protected property right was, therefore, not clearly established because, at the time of the events giving rise to her action, the contours of her alleged right were not "sufficiently clear that a reasonable official would understand that his or her conduct violate[d] that right." *See Durham v. Nu'Man*, 97 F.3d at 866.

The only possible wrongdoing alleged by Plaintiff is that that Defendant Fobbs failed to find the tiny piece of paper in decedent's wallet earlier so that Plaintiff Badder could have been identified sooner as Phillips' next of kin. At most, this would constitute negligence, and it is well-settled that negligence is insufficient to support a Section 1983 Fourteenth Amendment due process claim. *See Daniels v. Williams*, 474 U.S. 327, 333-336, 106 S.Ct. 662 (1986) (*overruling Parratt v. Taylor*, 451 U.S. 527, 101 S.Ct. 1908 (1981), and holding that negligent conduct does not implicate the due process clause of

the Fourteenth Amendment); *Davidson v. Cannon*, 474 U.S. 344, 345-348, 106 S.Ct. 668 (1986); *see also Brown v. Kordis*, 46 F. App'x 315, 317 (6th Cir. 2002) (negligence is insufficient to support a §1983 claim); *Kaminski v. Children's Hospital of Michigan*, ___ F. Supp. 2d ___, 2014 WL 186088 at *5 (E.D. Mich. Jan. 15, 2014) (a single incident of negligence is insufficient to establish liability under § 1983).

For the foregoing reasons, the Court concludes that individual Defendants Schmidt, Fobbs and Davis are entitled to summary judgment on Plaintiff's Section 1983 claim in Count II of her Complaint on the basis of qualified immunity.  *See Drogosch*, 557 F.3d at 379.

## D.  PLAINTIFF CANNOT MAKE OUT A § 1983 CLAIM BASED ON FAILURE TO TRAIN, FAILURE TO SUPERVISE, OR NEGLIGENT HIRING

Plaintiff also has sued Defendant Schmidt in his official capacity as Chief Wayne County Medical Examiner, and among Plaintiff's various allegations in Count II, Plaintiff alleges Schmidt's failure to train, failure to supervise and negligent hiring of WCMEO medical examiner investigators.  A claim against a public employee in his official capacity is deemed to be a suit against the governmental entity, not a suit against the official personally.  *Kentucky v. Graham*, 473 U.S. 159, 165-66, 105 S.Ct. 3099, 3105 (1985).  The standard for municipal liability in negligent hiring, training, and retention is deliberate indifference. *Stricker v. Township of Cambridge*, 710 F.3d 350, 365 (6th Cir. 2013); *Fox v. DeSoto*, 489 F.3d 227, 238 (6th Cir. 2007); *see also City of Canton v. Harris*, 489 U.S. 378, 388, 109 S.Ct. 1197,1204 (1989) ("Inadequacy of training may

29

serve as the basis for § 1983 liability only where the municipality's failure to train amounts to deliberate indifference to the constitutional rights of its citizens.")

However, where the individual municipal defendants did not violate a clearly-established right, the municipality cannot make out a § 1983 claim based on failure to train/supervise. *See Hagans v. Franklin Cnty. Sheriff's Office*, 695 F.3d 505, 511 (6th Cir. 2012) "'[A] municipal policy maker cannot exhibit fault rising to the level of deliberate indifference to a constitutional right when that right has not yet been clearly established.'" *Id.* (quoting *Szabla v. City of Brooklyn Park*, 486 F.3d 385, 393 (8th Cir.2007) ( en banc)). *See also  Williamson v. City of Virginia Beach,* 786 F. Supp. 1238, 1264-65 (E.D. Va. 1992)*, aff'd,* 1993 WL 127961 (4th Cir. Apr. 16, 1993) ("Assuming that the constitutional rights alleged by plaintiff did exist, the conclusion that they were not clearly established negates the proposition that the city acted with deliberate indifference.  'To be 'deliberately indifferent' to rights requires that these rights be clearly established.'" *Id*. (quoting *Watson v. Sexton*, 755 F.Supp. 583, 588 (S.D.N.Y.1991)).  As observed by the court in *Zwalesky v. Manistee County*, 749 F. Supp. 815 (W.D. Mich. 1990), "it would be irrational to hold that a municipality has shown a deliberate indifference to the rights of its citizens by failing to train its personnel when its officers have violated no clearly established right." *Id.* at 820.

Because the Court has concluded that the individual WCMEO defendants did not violate any clearly-established constitutional right, Plaintiff's cannot make out a § 1983 official capacity claim against Defendant Schmidt based on failure to train/supervise or

negligent hire.

### E.  PLAINTIFF FAILS TO STATE A COGNIZABLE § 1983 POLICY OR CUSTOM CLAIM

Plaintiff also argues in her response brief that because she sued Defendants Schmidt, Davis and Fobbs both individually, and "while in the course and scope of their employment with Defendants Office of the Wayne County Medical Examiner and Charter County of Wayne," she has stated a cause of action against Wayne County and in so doing, she has automatically alleged that Wayne County violated her rights as a result of an unconstitutional custom or policy.  The Court knows of no authority for this proposition.

It is axiomatic that "a municipality cannot be held liable solely because it employs a tortfeasor -- or, in other words, a municipality cannot be held liable under § 1983 on a respondeat superior theory." *Monell v. Department of Social Services*, 436 U.S. 658, 691, 98 S.Ct. 2018 (1978).  Such a respondeat superior claim is, at best, what Plaintiff here has alleged.  "To establish municipal liability pursuant to § 1983, a plaintiff must allege an unconstitutional action that 'implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers' or a 'constitutional deprivation [ ] visited pursuant to governmental custom even though such a custom has not received formal approval through the body's official decisionmaking channels.'" *Shamaeizadeh v. Cunigan*, 338 F.3d 535, 556 (6th Cir.2003), *cert. denied*, 541 U.S. 1041 (2004) (quoting *Monell*, 436 U.S. at 690-91, 98 S.Ct. 2018 (alteration in

31

original)).  However, a plaintiff must adequately **plead** in her complaint (1) that a violation of a federal right took place, (2) that the defendants acted under color of state law, and (3) that a municipality's policy or custom caused that violation to happen. *Lambert v. Hartman*, 517 F.3d 433, 439 (6th Cir.2008), *cert. denied*, 555 U.S. 1126 (2009).  A mere isolated unconstitutional act cannot establish *Monell* liability absent proof of some policy or custom that can be attributed to an official policymaker. *Oklahoma City v. Tuttle*, 47 U.S. 808, 823-24, 105 S.Ct. 2427 (1985).  No such policy or custom was raised as an issue in Plaintiff's Complaint.

Furthermore, for a municipality to be liable under Section 1983, the local government policy or custom "must be the moving force of the constitutional violation." Monell at 690-95.  To satisfy the *Monell* requirements, a plaintiff must identify the policy, connect the policy to the municipality itself, and show that the particular injury was incurred because of the execution of that policy.  *See Garner v, Memphis Police Dep't*, 8 F.3d 358, 365 (6th Cir. 1993), *cert. denied*, 510 U.S. 1177 (1994).  Plaintiff here has alleged no such nexus let alone made such a showing.  In fact, rather than demonstrate that execution of a WCMEO policy caused her deprivation, in her brief in response to Defendants' motion for summary judgment, Plaintiff states that "[t]he events and actions that led to the subject action **are in direct contrast** to the Policies and Procedures of the Wayne County Medical Examiner's Office."  [*See* Plaintiff's Brief, p. 15.]  However, an action allegedly taken in derogation of a policy does not establish that it was the policy itself that caused her deprivation.

32

Plaintiff also purports to rely upon a WCMEO "custom" of delay in notifying next of kin.  In support of such an alleged "custom," Plaintiff relies upon an August 2009 newspaper article regarding unclaimed bodies in the Wayne County morgue, the vast majority of which, according to the article, remained in the morgue's cooler not due to delay on the part of the medical examiner's office in locating next of kin; rather the bodies remained in the morgue *after* next of kin were notified but, because of lack of finances to pay for a funeral, the relatives had yet to retrieve them.  [*See* Plaintiff's Ex. 6.]  The article says nothing about delay in notification of next of kin or of bodies being allowed to decompose.

In any event, this purported "evidence" of an unconstitutional custom cannot be considered by the Court because it is hearsay.  It is well-settled that inadmissible hearsay cannot be used to oppose summary judgment.  *Hartsel v. Keys*, 87 F.3d 795, 803 (6th Cir. 1996), *cert. denied*, 519 U.S. 1055 (1997); *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 927 (6th Cir.1999); *Alpert v. United States*, 481 F.3d 404, 409 (6th Cir.2007); see also Fed. R. Civ. P. 56(c)(2), (4).  As such, "hearsay evidence" used to counter a motion for summary judgment "must be disregarded."  *Alexander v. Caresource*, 576 F.3d 551, 558 (6th Cir. 2009).

Based on the foregoing discussion, the Court concludes that Plaintiff has failed to state a cognizable § 1983 policy or custom claim.

## IV. CONCLUSION

For all of the reasons, the Court concludes that Plaintiff has failed to make out a §

1983 claim for violation of her procedural due process rights under the Fourteenth Amendment.  Therefore,

IT IS HEREBY ORDERED that Defendants' Motion for Summary Judgment **[Dkt. #27]** is GRANTED on Count II of Plaintiff's Complaint, and Plaintiff's Section 1983 claims in that Count, accordingly, are DISMISSED, WITH PREJUDICE.

Plaintiff's Section 1983 claims are the only claims in Plaintiff's Complaint over which this Court has subject matter jurisdiction.  All of the claims over which the Court had subject matter jurisdiction having been dismissed, and Plaintiff's remaining claims in Counts I, III, and IV of her Complaint being purely state law claims, pursuant to 28 U.S.C. § 1367(c), the Court declines to exercise supplemental jurisdiction over those claims.  Accordingly,

IT IS FURTHER ORDERED that Plaintiff's claims of gross negligence, vicarious liability, and violation of Michigan statutory law in Counts I, III, and IV of her Complaint are DISMISSED, WITHOUT PREJUDICE.

Let Judgment be entered accordingly.


Dated:  October 7, 2014                    s/Gerald E. Rosen
                                           Chief, Judge, United States District Court


I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on October 7, 2014, by electronic and/or ordinary mail.

                                           s/Julie Owens
                                           Case Manager, (313) 234-5135

34